IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PAUL DAVID HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:11-cv-01044 |
| v. | ) | Judge Nixon |
| | ) | Magistrate Judge Knowles |
| CITY OF DICKSON, TENNESSEE, and | ) | |
| SETH GOODWIN, | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court is Defendants' Motion for Summary Judgment ("Motion"),

requesting the Court grant Defendants summary judgment on the basis of qualified immunity for

Defendant Seth Goodwin and lack of municipal liability for Defendant City of Dickson, Tennessee

("Dickson"). (Doc. No. 20.) In addition, Defendants filed a Motion to Strike, seeking to exclude

from consideration at the summary judgment stage an expert affidavit and report filed by Plaintiff

Paul David Harrison. (Doc. No. 43.) For the reasons stated below, the Court **GRANTS in part** and

**DENIES in part** both Motions.

In addition, the Court **SCHEDULES** trial to begin on **August 13, 2013, at 9:00 a.m.**, with a

pre-trial conference **SCHEDULED** for **August 2, 2013, at 10:00 a.m.**

## I.    BACKGROUND

### A.    *Factual Background*[1]

On November 1, 2010, City of Dickson Police Department ("Department") officer Seth

Goodwin responded to a call for a vehicle crash with possible injuries. When Goodwin arrived at

---

[1] Unless otherwise indicated, the facts in this section are undisputed and taken from Harrison's
Responses to Defendants' Statement of Undisputed Material Facts (Doc. No. 33) and Defendants'
Response to Plaintiff's Statement of Additional Disputed Material Facts (Doc. No. 46).

1

the scene, Plaintiff Paul Harrison—the victim of a hit-and-run accident while driving his motorcycle—was sitting in the roadway, attended to by emergency personnel. Harrison had at least one obvious injury, a severely fractured ankle, was in pain, and sat immobilized by his injuries.

When Goodwin arrived, an EMT with the Dickson Fire Department named Blair Higgins was kneeling behind Harrison and holding Harrison's head in c-spine—that is, cradling his head to prevent movement and any further injury to it or his neck. Goodwin approached Higgins to ask if he needed assistance, and Higgins responded that he did not. Goodwin then returned to his car to retrieve a traffic vest so that he could direct traffic around the accident scene.

A bystander then approached Lieutenant Jeff Salewsky with the fire department and relayed that Harrison had a knife in his possession that had fallen on the road during the accident. While it is undisputed that Harrison had a closed pocketknife in his hand, the parties dispute the details of what occurred next.

According to Goodwin, he heard Salewsky say something about a knife and saw Salewsky unsuccessfully attempt to take something from Harrison, who was still sitting and held in c-spine by Higgins. (Doc. No. 27 at 96.) Goodwin testified that he approached Salewsky, who told Goodwin that Harrison had a knife they needed to remove.[2] (*Id.* at 97.) Goodwin then ordered Harrison several times to put the pocketknife down or to give it to him—issuing a warning that if Harrison did not obey, Goodwin would take the pocketknife—but Harrison refused to comply. (*Id.* at 103, 108.) Goodwin testified that he then grabbed Harrison's wrist and arm (of the hand with the

---

[2] A detective investigating the incident interviewed Salewsky, who appears not to have mentioned speaking with Goodwin after asking Harrison for the knife. (Doc. No. 24 at 5.) Rather, Salewsky told the investigator that "since [Harrison's] leg was as injured as it was and [Higgins] was holding c-spine[,] [Harrison] was not much of a threat," and Salewsky left Harrison "to get supplies from the truck." (*Id.*) According to Salewsky's statement to the investigator, he turned back to the scene only after he heard a commotion. (*Id.*) However, in an affidavit provided for summary judgment, Salewsky states that he told Goodwin that Harrison had a knife and that "'we need to get the knife from him.'" (Doc. No. 23 ¶ 3.)

2

pocketknife), and that Harrison pulled away and attempted to push the pocketknife into his motorcycle helmet. (*Id.* at 109.) Goodwin then struck Harrison in the face with his forearm, causing Harrison to let go of the pocketknife. (*Id.* at 110.)

According to Harrison, Salewsky never asked him for the pocketknife, Goodwin never issued a warning, and Harrison told Goodwin that he had called his cousin to retrieve his personal belongings. (Doc. Nos. 22 at 33–35; 41 ¶ 3.) He testified that Goodwin approached him, issued several commands that he refused, and then without warning struck him in the face with Goodwin's forearm and elbow. (Doc. No. 22 at 9, 31–32, 34–35.)

Higgins, Goodwin, and Harrison all testified that the force of the strike knocked both Harrison and Higgins to the ground. (Doc. Nos. 22 at 35; 25 at 24; 27 at 114.) According to Harrison, the strike from Goodwin also knocked out one of Harrison's teeth and caused the side of his face to swell. (Doc. No. 22 at 8, 45.) Emergency room records showed a contusion under one of his eyes, as well. (*Id.* at 53.) Harrison testified that, at the time of the incident, he had suffered a broken leg, foot, and hand as a result of the motorcycle accident. (*Id.* at 11–12.)

It is undisputed that Harrison never threatened Higgins, was not combative or violent with first responders, and was never told why he could not keep the pocketknife. Higgins, the only first responder in physical contact with Harrison, testified that he "wasn't too terribly concerned" about the knife, considering Harrison "wasn't gonna get up and run off." (Doc. No. 25 at 18.) In addition, Salewsky stated after the incident that the pocketknife was small enough that Harrison could have kept it in his pocket. (Doc. No. 24 at 5.)

A detective in the Department conducted an internal investigation into Goodwin's use of force by speaking with Higgins, Salewsky, and Goodwin, and reviewing in-car audio recordings of the incident. He did not interview Harrison. (Doc. No. 41 ¶ 9.) The detective stated in his report that "[o]n crash scenes I have been involved with, if a 'weapon' is located it was secured, if it was

in a person's pocket, purse or backpack and not seen by me, I did not go searching for it(without [sic] a reason)." (Doc. No. 24 at 7.) The detective concluded that he believed Goodwin had not violated Department policy or state law.

The Department has a use-of-force policy that includes a "force continuum" outlining the steps officers should follow in applying force. In addition, officers in the Department must meet the Basic Law Enforcement Training standards set by the state Peace Officer Standards and Training ("POST") Commission. Goodwin attended police academy at Walters State Community College from April 5, 2010, to May 28, 2010, and received his POST certification on June 8, 2010. He then received field training, which involved following a Department field training officer for two to three weeks on each of three different shifts. He began patrol in the summer of 2010.

While Goodwin received training on use of force at the police academy, the Department did not train him on how to address or question an injured subject. The Department's Chief of Police, Ricky Chandler, testified that the Department does not have a policy on how to approach an injured victim at an accident scene or an injured person held in c-spine. (Doc. No. 26 at 44.)

B. *Procedural Background*

On November 1, 2011, Harrison filed a Complaint against Goodwin and Dickson, alleging violations of his civil rights under 28 U.S.C. § 1983 and setting forth several state-law claims. (Doc. No. 1.) On October 31, 2012, Defendants filed the instant Motion (Doc. No. 20), along with a Memorandum in Support (Doc. No. 28), several depositions (Doc. Nos. 22, 25–27), an affidavit (Doc. No. 23), a statement of undisputed facts (Doc. No. 29), and a list of Rule 26 disclosures that included a report of the internal investigation (Doc. No. 24). Harrison filed a Response on December 10, 2012 (Doc. No. 32), along with a Memorandum in Support (Doc. No. 35), depositions (Doc. Nos. 37–40), an affidavit (Doc. No. 41), an expert witness declaration and report (Doc. No. 42), and both a response to Defendants' statement of facts and an additional statement of

4

facts (Doc. Nos. 33–34). On December 20, 2012, Defendants filed a Motion to Strike Harrison's expert witness declaration and report (Doc. No. 43), along with a Memorandum in Support (Doc. No. 44), a Reply to the instant Motion (Doc. No. 45), and a response to Harrison's statement of additional facts (Doc. No. 46).

## II. STANDARD OF REVIEW

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to

5

support a fact.  Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment."  *Id.*  If the court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III.  ANALYSIS

Plaintiff has filed federal claims under 42 U.S.C. § 1983 and state claims against both Defendants.  The Court evaluates each in turn, after addressing the motion to strike.

### A.  *Motion to Strike*

As a threshold matter, Defendants argue the Court should strike and disregard a declaration and report by Harrison's expert, Phillip L. Davidson, that Harrison filed with his response to the Motion for Summary Judgment.  (Doc. No. 44 at 1.)  Defendants argue that (1) the report is wholly conclusory and relies on insufficient facts or data; and (2) it is not relevant and will not assist the trier of fact in this case.  (*Id.*)  Plaintiff has offered no response.

A court has broad discretion in ruling on the admissibility of expert testimony, including at summary judgment.  *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005).  Federal Rule of Civil Procedure 56(c)(4) provides that a "declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  In reviewing such declarations, a court should "disregard conclusions of law (or 'ultimate fact')" and consider only the facts provided.  *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002).

6

At summary judgment, courts hold declarations by expert witnesses to the same standards as other declarations, *see Brainard*, 432 F.3d at 663, as well as to Federal Rule of Evidence 702, which governs the admissibility of expert testimony, *see Thomas v. City of Chattanooga*, 398 F.3d 426, 431–32 (6th Cir. 2005).  Federal Rule of Evidence 702 states that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As a result, "an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."  *Brainard*, 432 F.3d at 664 (citation omitted).  By contrast, "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process" and his testimony may be disregarded.  *Id.* (citation and quotation marks omitted).

Here, Davidson—a recognized expert in police practices, *see Thomas*, 398 F.3d at 432— submitted a declaration that incorporated an accompanying seven-page report detailing his evaluation of the incident with Goodwin.  (Doc. Nos. 42; 43.)  His report covered two questions: (1) whether Goodwin's use of force was reasonable; and (2) whether the Dickson Police Department failed to train its officers, proximately causing Goodwin's actions.  (Doc. No. 43 at 3.)  Defendants challenge the report in its entirety.

As to the first question addressed, the Court finds it appropriate to strike Davidson's opinions relating to the reasonableness of Goodwin's action because his opinion is based on insufficient facts.  Fed. R. Evid. 702(b).  As Defendants argue, Davidson based his observations on discovery materials provided before any depositions took place in the case.  (Doc. No. 44 at 3.)  These materials appear not to include any substantial interviews of Goodwin, Higgins, or Harrison—the three people involved in the incident—and include only "various statements by

7

witnesses at the scene" and the department's internal investigation. (Doc. No. 42-1 at 3–4.) This matters under the reasonableness analysis because the depositions provided more details of the incident; included testimony by Harrison, whom police never interviewed (Doc. No. 41 ¶ 9); and highlighted inconsistencies in at least some of the on-scene statements (Doc. No. 25 at 32–32). In addition, the Court finds Davidson's conclusion as to reasonableness is based solely on a recitation of facts—without any apparent context or analysis provided by Davidson's expertise and experience—such that it would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). *See also Hubbard v. Gross*, 199 F. App'x 433, 442–43 (6th Cir. 2006) ("Because testimony about whether the officers used reasonable force is a legal conclusion and may confuse the trier of fact, the district court is within its sound discretion to exclude it.").

As to the second issue, implicated by Harrison's municipal liability claims, the Court finds Davidson's opinions sufficiently helpful and well-founded—though limited in scope—to survive the motion to strike. Fed. R. Evid. 702. While Davidson did not review Chandler's deposition testimony related to department-wide training or Goodwin's testimony discussing the training he received, Davidson did review the use-of-force policies the department provided in discovery. (Doc. No. 42-1 at 3, 5–6.) He limited his opinion to his review of these written policies and compared them to policies of other police departments. (*Id.* at 6.) The Court finds this likely helpful to provide context for the policies at issue here. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures. . . . Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself."); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) ("Rule 702

8

should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact.").

In addition, though Defendants argue Davidson does not support his statement that a subject's head is a "no strike zone" and thus does not meet the requirements of Rule 56(e) (a declarant must support assertions of fact) (Doc. No. 44 at 4), the Court notes that Davidson's almost 200 pages of supporting documents provide sufficient explanation. For instance, a lesson plan from a "Subject Control Techniques" training by the Davidson County Sheriff's Office states explicitly that the head is one of five no-strike zones for maintaining subject control. (Doc. No. 42-2 at 7.) Following that class, the sheriff's office requires officers to sign a release stating they received instruction that the head is a no-strike zone because of the risk of blunt trauma to the brain, ears, eyes, and nose. (*Id.* at 23.)

Thus, the Court **GRANTS in part** the Motion to Strike (Doc. No. 43), and **DENIES it in part**. In evaluating Defendants' Motion for Summary Judgment, the Court will consider Davidson's opinion only as it relates to Harrison's failure to train claim, and in the context of other evidence.

B.      *§ 1983 Claims*

In his federal claims, Harrison alleges Defendants have violated his constitutional rights and brings suit under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . [or] suit in equity.

42 U.S.C. § 1983 (2012). "The basic requirements of a § 1983 claim include a showing that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001). Here, Defendants do not dispute that

9

Goodwin acted under color of law at the time of the alleged assault on Harrison or that Harrison has alleged a violation of his Fourth Amendment rights[3] (Doc. No. 28 at 6); rather, the disputed issues are whether Goodwin is entitled to qualified immunity and whether Dickson can be held liable under a municipal liability theory.

### 1. Qualified Immunity

Defendants argue that the Court should dismiss the § 1983 claims against Goodwin because he is entitled to qualified immunity from suit. (Doc. No. 28 at 7.) "A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established" at the time. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation omitted). *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). While a court may address these two steps "in any order," "both must be answered in the affirmative for the case to go to a factfinder to decide if each officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights." *Martin v. City of Broadview Heights*, No. 11-4029, 2013 WL 1405247, at *7 (6th Cir. April 9, 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

---

[3] While Harrison pled the excessive force claim against Goodwin as a violation of both his Fourth and Fourteenth Amendment rights, case law makes clear this Court should allow only the Fourth Amendment claim to proceed. *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that all excessive force claims "should be analyzed under the Fourth Amendment . . . rather than under a 'substantive due process' approach" under the Fourteenth Amendment); *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) (citing *Graham*, 490 U.S. at 394–95). Thus, the Court **DISMISSES** Harrison's Fourteenth Amendment claims. In addition, Harrison has alleged excessive force claims against Goodwin in both Goodwin's individual and official capacities. Because a suit against an officer in his official capacity is treated as a suit against the municipality—and Dickson cannot be held liable for individual officer actions under § 1983 absent an allegation that the action is part of the municipality's custom or policy—the Court further **DISMISSES** the § 1983 claims against Goodwin in his official capacity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992).

a. Constitutional Violation

First, Defendants argue Goodwin did not violate Harrison's Fourth Amendment rights because he took objectively reasonable actions in light of the circumstances. Not only did Goodwin have the authority to secure the safety of the scene, Defendants argue, but "the force he used was proportionate to the nature of the impediment and behavior of Plaintiff." (Doc. No. 28 at 9.) They insist that Goodwin's use of a "single, distractionary strike with his forearm" was justified in light of Harrison's defiance of Goodwin's commands. (*Id.*) By contrast, Harrison argues that he posed no threat to Goodwin, who could have locked Harrison's arm to retrieve the pocketknife, rather than hitting him in a "no strike zone." (Doc. No. 35 at 10–11.)

A court reviews "*all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" under the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 395. "At the summary judgment stage," once a court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [an officer's] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis removed).

In determining whether an officer acted reasonably, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). The court must draw on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses and immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In addition, the Sixth Circuit has held that "the definition of reasonable force is partially dependent on the demeanor of the suspect." *Solomon v. Auburn Hills Police*

*Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (citation and quotation marks omitted). Lastly, a court must judge the reasonableness of the force on the totality of the circumstances, *Morrison*, 583 F.3d at 401, and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

Here, the Court finds that Harrison has shown enough evidence for a reasonable jury to conclude that Goodwin acted unreasonably in dealing with an injured and non-threatening motorcycle accident victim. It is undisputed that Goodwin struck Harrison in the face—using his forearm—suddenly while Harrison sat on the ground, with obvious injuries and while an EMT held him in c-spine. As justification, Defendants claim Goodwin had the authority and responsibility to secure the scene of the accident, which included guaranteeing the safety of the first responders. (Doc. No. 28 at 9.) Based on the *Graham* factors, the Court finds this justification inadequate to support Goodwin's action, which—by all accounts—carried enough force to knock Harrison, Higgins, and Goodwin to the ground (Doc. Nos. 22 at 35; 25 at 24; 27 at 114) and, according to Harrison, knocked out one of his teeth and left the "whole side of [his] face . . . swollen" (Doc. No. 22 at 45).

First, in looking at the severity of the crime, the Court finds Harrison was never the suspect of a crime at the accident scene. (*See* Doc. No. 27 at 123–24.) It is undisputed that he was the victim of a hit-and-run accident, and that the police at the scene primarily served to direct traffic and ensure safety. (Doc. No. 27 at 96.)

Second, the evidence shows Harrison posed no immediate threat to Goodwin or others that would justify use of physical force. *See Morrison*, 583 F.3d at 404–05 ("once the detainee ceases to pose a threat to the safety of the officers or others, the legitimate government interest in the application of significant force dissipates."). At the time of the incident, Harrison lay on the ground with a broken leg, hand, and ankle, the latter of which Goodwin described as "obviously" fractured

12

and which Higgins noted had a "bone . . . sticking out of the skin." (Doc. Nos. 22 at 11–12, 58; 25 at 12; 27 at 104.) Higgins was holding Harrison—who was visibly in pain—immobilized by cradling his head in c-spine to stabilize him in case of neck injury. (Doc. Nos. 22 at 58; 27 at 99, 101, 105, 127.) Given Harrison's state, it's no surprise that not one witness testified that Harrison posed a threat to Goodwin, the EMTs, or bystanders. (*See* Doc. Nos. 22 at 59; 25 at 15, 19, 32; 27 at 98, 113.) The only person near Harrison—Higgins—testified that, while he knew Harrison had a pocketknife, "[he] wasn't too terribly concerned with it," given Harrison's injured state. (Doc. Nos. 25 at 18; 27 at 102.) After the incident, Salewsky echoed Higgins and told a police investigator that "since [Harrison's] leg was as injured as it was . . . he was not much of a threat." (Doc. No. 24 at 5.)

Even Goodwin acknowledged that Harrison was "resistant" to Goodwin's commands but not violent, and that Harrison never made any verbal threats, never attempted to open the pocketknife, and never tried to hurt anyone with it. (Doc. No. 27 at 98, 100–01, 113, 117.) Goodwin testified that "[t]he only thing that . . . may have been a potential threat was the fact that [Harrison] was refusing to put [the closed pocketknife] down." (Doc. No. 27 at 100.) This, at most, constitutes passive resistance, which the Court finds did not justify an unwarned strike to Harrison's head when he lay in c-spine. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007) (plaintiff's "method of resisting [refusing to put his hands behind his back] could be characterized as passive such that the resistance was not so great as to require . . . rough treatment"); *St. John v. Hickey*, 411 F.3d 762, 772 (6th Cir. 2005) (officer "testified that, at most, [plaintiff] was passively resisting arrest by sitting prone," an action that did not justify more than minimal force), *abrogated on other grounds by Scott*, 550 U.S. at 381 n.8.

Third, Harrison made no attempt to evade police; rather, by all accounts he was trapped on the ground, immobilized.  As Goodwin acknowledged at deposition, he knew Harrison was injured, in pain, and "wasn't going to get up and run off."  (Doc. No. 27 at 127.)

Lastly, all witnesses testified that Harrison had a cooperative, though upset and shaken, demeanor until Goodwin struck him in the face.  Even at that point—when "the scene got chaotic," according to Higgins—Harrison began crying and became irate and upset, but still was not combative.  (Doc. No. 25 at 26, 33–34.)  *See Solomon*, 389 F.3d at 175 (officers' aggressive actions to lift and forcibly place a compliant and disabled arrestee in a police car were unreasonable).

Thus, balancing the governmental interest—to secure the accident site—and the intrusion itself, the Court finds a reasonable jury could find Goodwin's action entirely unjustified.  *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 253–54 (6th Cir. 2010) (holding that "a jury could reasonably find that slamming an arrestee into a vehicle constitutes excessive force when the offense is non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting").

Nonetheless, Defendants seek to minimize the action as a "single, distractionary blow" and argue that Goodwin was not required to use the least intrusive force.  (Doc. No. 28 at 9–10.)  The Court understands that the act of striking a person in the face once may not generally rise to the same degree of Fourth Amendment intrusion as the use of lethal force, excessive taser use, or even an unjustified dog bite.  However, the Sixth Circuit has made clear that, in determining if an officer's actions amount to a Fourth Amendment violation, the court considers not the "extent of the injury inflicted," but whether an officer subjects a detainee to gratuitous violence.  *Morrison*, 583 F.3d at 407 (citations and quotation marks omitted).  In minimizing Goodwin's action, Defendants fail to acknowledge the severity of Goodwin's strike, given its location and Harrison's obvious state, and the utter lack of immediate justification for such a strike, given the facts discussed above.

14

To call a forearm strike in the face to an incapacitated accident victim's face a "distractionary" mechanism crosses the line of credibility: Goodwin's action did not simply distract Harrison, it potentially endangered him.

    b. Clearly Established Right

  Even if Goodwin did violate Harrison's Fourth Amendment rights, Defendants argue that "no reasonable officer would have known that this brief show of force, where a request for assistance had been made by first responders and the Plaintiff possessed a weapon that he unreasonably refused to relinquish, was unlawful and in violation of a clearly established constitutional right." (Doc. No. 28 at 10.) In support, they rely on a single argument that the Fourth Amendment does not require officers to use the least intrusive level of force. (*Id.*) In response, Harrison similarly states no case law to support his contention that his rights were clearly established at the time. (Doc. No. 35 at 8–11.)

  Under *Saucier*, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). That is, "there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (citations omitted).

  Here, the Court finds it was clearly established in 2010 that an arrestee who did not actively resist arrest and posed no immediate threat to an officer had a right to be free from gratuitous and

15

excessive force.  *See Morrison*, 583 F.3d at 404 (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006)) ("This Court has consistently held in light of the reasonableness standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'"); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."); *St. John*, 411 F.3d at 774 ("the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest was clearly established as of November 9, 2000"); *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002) (citation omitted) (the unconstitutionality of the "use of gratuitous force against helpless and incapacitated suspect[s] during arrest [was] well established in 1991"); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("our court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line").

The Sixth Circuit has made clear that this right to be free from gratuitous violence applies to bystanders and non-arrestees, such as Harrison.  *Dugan v. Brooks*, 818 F.2d 513, 516–17 (6th Cir. 1987) (officer striking a person—who had committed no crime—on the head without cause and without warning violated the Constitution).  *See also Dunigan v. Noble*, 390 F.3d 486, 499 (6th Cir. 2004) (Moore, J. dissenting) ("the right of bystanders not to be attacked, particularly from behind and without provocation, was clearly established [in 2001] in this court and others.").

The court has also held that a slap to the face, specifically, can constitute excessive force when a person does not pose a threat to officer safety.  *Pigram ex. rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) (citing *Carico v. Benton, Ireland & Stovall*, 68 F. App'x 632, 637 (6th Cir. 2003)).

Thus, the Court finds a reasonable officer in Goodwin's position would have been on notice that striking Harrison in the face with his forearm—when Harrison posed no immediate threat to

him or others—violated Harrison's Fourth Amendment rights.  As a result, the Court finds Goodwin is not entitled to qualified immunity and **DENIES** summary judgment on Harrison's § 1983 claim against Goodwin in his individual capacity.

### 2.   Municipal Liability

Defendants also move for summary judgment on Harrison's § 1983 claim against the city of Dickson, arguing he has not raised a genuine dispute of fact on any of his allegations.  (Doc. No. 28 at 11–14.)  Under § 1983, municipalities may be held liable only when their customs or policies are the "moving force" behind a constitutional violation.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–691 (1978).  In his Complaint, Harrison stakes out three separate allegations against Dickson under his § 1983 claim: (1) the city failed to train its officers; (2) it failed to adopt a policy regarding use of force "against unarmed and injured citizens"; and (3) it failed to supervise and discipline Goodwin.  (Doc. No. 1 ¶¶ 33–35.)  In his Response, Harrison presents this claim as based on two theories of municipal liability.  First, he alleges Dickson had a policy or practice of deliberate indifference to constitutional rights based on its failure to train; second, he alleges the Department "ratified" Goodwin's unconstitutional conduct by failing to supervise and discipline him.  (Doc. No. 35 at 12–14.)

### a.   Failure to Train

Defendants argue the failure to train theory fails on summary judgment because Harrison has not established sufficient culpability on Dickson's part or shown a causal link between the training and the excessive force claim.  (Doc. No. 28 at 12–14.)  In addition, Defendants argue that the Department has "extensive" use-of-force policies and requires its officers to meet the same level of training as mandated under state law.  (*Id.* at 11, 13.)  In response, Harrison appears to argue that the absence of any officer training or Department policy related to dealing with injured subjects alone is enough to establish a genuine dispute issue of fact.  (Doc. No. 35 at 12–13.)

To hold a municipality liable under § 1983 for deprivations of federal rights stemming from the municipality's failure to train employees, a plaintiff must show that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). The Sixth Circuit has identified two ways to demonstrate a municipality's deliberate indifference under a failure to train theory. First, Plaintiff may "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation and quotation marks omitted). Alternatively, "'a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). *See Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (characterizing the second method as a "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction").

Here, the Court first finds Harrison has raised a genuine dispute of fact as to whether Dickson adequately trained its officers for the tasks performed, which involve responding to a vehicle accident scene. By his testimony, Goodwin began work for the Dickson Police Department immediately after finishing an eight-week training at the police academy in June 2010, and spent approximately six to nine weeks shadowing three supervisors before taking to patrol by himself that summer. (Doc. No. 27 at 37, 40–43.) At the police academy, he took classes on basic emergency medicine (including CPR) and on use of force. (*Id.* 37–46.) When he joined the Department, he received the Department employee handbook and general orders. (*Id.* at 50.) However, he testified

18

that he received no instruction on mitigating use of force when dealing with injured persons, whether at the police academy or the Department. (*Id.* at 136.) Similarly, Chandler testified that the Department does not have a policy or train its officers on how to approach, question, or deal with injured subjects. (*Id.* at 35–36, 44.) Nor does it have a specific policy on how to approach a person held in c-spine (*id.*), which Higgins testified is automatically applied to victims of motor vehicle accidents (Doc. No. 25 at 10–11). As a result, the Court finds that the Department did not offer any training on injured subjects as part of its in-service trainings; nor did the department issue guidelines on handling injured persons in its general orders dealing with use of force.

Defendants argue that the city should not be liable for inadequate training because Goodwin and other Dickson officers must pass state training requirements before entering service. However, the Sixth Circuit has made clear that simply offering some training does not shield a department from liability when a plaintiff calls into question the adequacy of the training. *Russo*, 953 F.2d at 1047. In *Russo*, the Cincinnati Department provided its officers with a seven-hour "Disturbed-Distress Persons" course, but the court still held that plaintiff had raised sufficient evidence to call into question the adequacy of the training's content, based on officer testimony, an internal investigation, and an expert opinion. *Id.* Similarly, the court held this evidence sufficed to raise issues of the adequacy of the department's written policy dealing with barricaded suspects. *Id.* at 1047–48. Similarly here, Harrison does not argue that Dickson had no use of force policies or training at all, but that the existing training and policies were inadequate in light of the performed tasks.

Second, the Court finds sufficient evidence to raise a dispute as to whether Dickson was deliberately indifferent to its failure to train. While Harrison has not alleged a pattern of similar excessive force complaints by injured subjects put Dickson on notice, the Court finds a reasonable jury could find that such constitutional violations were foreseeable consequence of Dickson's lack

19

of instruction on how to deal with injured subjects at accident scenes. *See Shaner*, 172 F.3d at 931. *Compare Cherrington v. Skeeter*, 344 F.3d 631, 647 (6th Cir. 2003) (holding it was foreseeable that police make warrantless arrests and will need to know about arrestees' rights to probable cause determinations within 48 hours of arrest) *with Plinton*, 540 F.3d at 464–65 (holding no evidence existed of the "obvious potential" for constitutional violations by a county hiring an experienced undercover officer who was familiar with department policies, had DEA training, and worked in a division with a good conviction rate and no prior complaints of misconduct). As Defendants themselves state in arguing for the reasonableness of Goodwin's actions, Dickson police officers have the responsibility and authority to secure accident scenes to which they are routinely dispatched. The Courts finds it foreseeable that, in executing this duty as community caretakers, officers will interact with injured suspects and, without proper training, will use excessive force.

Finally, Harrison has shown sufficient evidence that the failure to train Goodwin on dealing with injured persons was closely related to or actually caused the constitutional violations complained of here. Though he had prior experience as an EMT before joining the police department, Goodwin testified that the consequences of his actions had not crossed his mind at the time of the incident. When asked whether he had considered that striking Harrison in the face while Harrison was held in c-spine could cause further injury, Goodwin responded that he "wasn't really thinking" that Harrison might have a head or neck injury or that a strike to the face might worsen his condition. (Doc. No. 27 at 127–28.) *See Pirolozzi v. Stanbro*, No. 5:07-cv-798, 2008 WL 1977504, at *12 (N.D. Ohio May 1, 2008) (officers' lack of awareness of the effects of their actions constituted, in part, sufficient evidence for a jury to find the actions were closely related to the constitutional violation). Given that Harrison's status as an injured person plays significantly into his excessive force claim, the Court finds a sufficient connection between Goodwin's lack of

training and the violation. Thus, the Court **DENIES** summary judgment on the failure to train theory.

### b. Failure to Supervise or Discipline

Defendants next argue Harrison's failure to supervise theory should not survive summary judgment because the Department adequately investigated Goodwin's use of force against Harrison. (Doc. No. 28 at 14.) Harrison disputes this, and argues that the Department's failure to conduct a meaningful investigation functionally ratified Goodwin's actions. (Doc. No. 35 at 13–14.)

As Harrison argues, the Sixth Circuit has allowed plaintiffs to establish a policy of deliberate indifference for a failure to investigate incidents of officer abuse adequately, on the basis that the lack of investigation and discipline is a "ratification" of the constitutional violation. *Leach v. Shelby Cnty.*, 891 F.2d 1241, 1248 (6th Cir. 1989). *See Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999); *Marchese v. Lucas*, 758 F. 2d 181, 188 (6th Cir. 1985).

Most recently, the Sixth Circuit has explained that, to prevail on such a claim, a plaintiff "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [violation] here." *Thomas*, 398 F.3d at 433 (citation omitted) (holding that plaintiff's failure to supervise claim cannot survive summary judgment without showing more than officer's potentially excessive use of force in plaintiff's case).

Here—while deposition testimony revealed a disturbing nonchalance Goodwin's failure to follow proper procedures after the incident and a seemingly haphazard system to track use-of-force reports—the Court finds Harrison has not shown sufficient evidence to raise a dispute of material fact as to whether the police department has a custom of acquiescence to constitutional violations.

21

On one hand, Harrison has shown evidence of multiple failings in the investigation into Goodwin's conduct. Harrison, for one, was never interviewed by any official to ascertain his view of the facts. (Doc. No. 41 ¶ 9.) As a result, the only person interviewed for the investigation who witnessed the incident was Goodwin himself, as Higgins told the investigator that he was looking away at the time Goodwin struck Harrison. (Doc. No. 25 at 23.) In addition, the Department failed to discipline Goodwin in any way, either for the use of force or for three errors Chandler conceded Goodwin made in handling the accident: (1) his failure to report the entire hit-and-run accident to the criminal division; (2) his failure to collect any witness statements regarding the accident, as called for by normal Department practice; and (3) his failure to issue a "be on the look out" alert for the vehicle that hit Harrison. (Doc. No. 26 at 52, 57–58.) Based on the deposition of Chandler, it's unclear whether the Department has any investigatory mechanism to deal with these types of lapses. In addition, Dickson appears to have a lax review policy on use-of-force incidents, with almost no monitoring of officers' repeated uses of force. Though Chandler testified that he does not routinely review these forms unless a supervisor calls his attention to an incident, he did indicate that he reviews the forms with field training officers on a yearly basis to assess—with the county sheriff— what type of in-service annual training to provide. (*Id.* at 26.) (The Department does not undertake specialized training for officers based on their behavior, relying instead on department-wide annual training.) Chandler, who has been the chief of police since 1992, could not recall disciplining an officer for a "founded" use-of-force complaint, except when he extended the probationary period for one officer who drew his gun while off-duty. (*Id.* at 29–30.)

At the same time, however, Harrison has not alleged that this failure to investigate followed a "clear and persistent pattern" within the Department. *Thomas*, 398 F.3d 433. Beyond over-arching statements about department processes in Chandler's deposition, Harrison has offered no

evidence that the Department inadequately investigated other use-of-force incidents or complaints. This alone is insufficient to meet his burden.

In addition, Harrison has offered no evidence to show that the Department's failure to investigate was a "moving force" behind or cause of the constitutional violation. *See Thomas*, 398 F.3d 433; *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994). Goodwin's inexperience likely cuts against Harrison here, as the incident occurred only two or three months after Goodwin began patrol. As a result, there is no evidence of any prior faulty investigations that might have led to him to believe he could behave unlawfully, immune from discipline. Thus, the Court finds Harrison has not met his burden to establish the failure to discipline theory and **GRANTS** summary judgment on this claim.

C.     *State Law Claims*

Harrison alleges four state law claims against Goodwin: (1) negligence, (2) assault and battery, (3) outrageous conduct, and (4) intentional infliction of emotional distress. (Doc. No. 1 ¶¶ 39–45, 55–60.) For each claim, Harrison also alleges Dickson is liable under respondeat superior theory and the Tennessee Governmental Tort Liability Act ("TGTLA"). (*Id.*) In addition, he alleges one count of negligence against Dickson only. (*Id.* ¶¶ 45–54.) Defendants argue that the Court should not exercise supplemental jurisdiction over these claims or, in the alternative, that it should grant Defendants summary judgment on all the claims. (Doc. No. 28 at 15–18.) Harrison argues that supplemental jurisdiction is appropriate here, and that he has raised a genuine issue of material fact on all the claims to survive summary judgment. (Doc. No. 35 at 19–25.)

23

1.      Supplemental Jurisdiction

Defendants primarily argue the Court should deny supplemental jurisdiction because it should grant summary judgment in Defendants' favor on Harrison's § 1983 claims.[4] (Doc. No. 28 at 15.) Not only has the Court denied summary judgment on most of these claims—rendering this argument moot—but the Court also finds supplemental jurisdiction appropriate for the claims against Goodwin. The Court finds these state claims do not raise a novel or complex issue of state law, nor do they substantially predominate over Harrison's § 1983 claims. 28 U.S.C. § 1367(c) (2012). In addition, no exceptional circumstances exist to cause the Court to decline jurisdiction. *Id.*

2.      Municipal Liability

Next, Defendants argue that the Court should dismiss all of Harrison's claims against Dickson because the city's immunity from suit has not been waived by the TGTLA, Tenn. Code Ann. §§ 29-20-101 to 29-20-408, in particular its "civil rights" exception. (Doc. No. 28 at 15.) The Court agrees.

The TGTLA codifies the state's common law rules on sovereign immunity and states exceptions to the general grant of immunity from suit. *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 776–77 (E.D. Tenn. 2010); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001). Section 29-20-205 of the TGTLA specifically waives the state's immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," unless

---

[4] Defendants also argue that the Court should decline supplemental jurisdiction over Harrison's negligence claim against Dickson for comity reasons, because Tennessee courts have original jurisdiction over claims under the TGTLA. (Doc. No. 28 at 15.) The Court finds this argument unpersuasive, given that original jurisdiction does not preclude federal jurisdiction and that declining jurisdiction would lead to duplicity of suit and wasted judicial resources. *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 850–51 (E.D. Tenn. 2011). However, because the Court addresses TGTLA immunity against all municipal claims below, it does not fully address this narrower argument based on jurisdiction.

the injury arises out of certain enumerated intentional torts, such as infliction of emotional distress and "civil rights." Tenn. Code Ann. § 29-20-205(2) (2012). *See Sallee v. Barrett*, 171 S.W.3d 822, 826 (Tenn. 2005).

There are two relevant corollaries to this waiver of immunity. First, Tennessee courts have held the TGTLA allows a plaintiff to hold a municipal entity vicariously liable for intentional torts not enumerated in Tenn. Code Ann. § 29-20-205(2)—such as assault and battery—only when the plaintiff shows negligence on the entity's part in allowing the intentional tort to occur. *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 368–69 (Tenn. 2011); *Limbaugh*, 59 S.W.3d at 79–84 (entity can be held liable for the negligent failure of one of its employees to supervise another employee who inflicted injury through an intentional battery); *Pendleton v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2004-01910-COA-R3-CV, 2005 WL 2138240, at *3 (Tenn. Ct. App. Sept. 1, 2005). Second, the Sixth Circuit has interpreted the "civil rights" exception to include claims arising under § 1983 and the United States Constitution. *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010). That is, if an otherwise valid claim under the TGTLA "arises out of the same circumstances giving rise to her civil rights claim under § 1983," then the state claim would fall under the civil rights exception and the city would be immune. *Id.* *See Campbell*, 695 F. Supp. 2d at 778 (recognizing TGTLA immunity when plaintiff's state law claims "clearly arise out of and directly flow from" the allegations in her § 1983 claims). The Sixth Circuit has admonished district courts to "parse the [T]GTLA issue on a claim-by-claim basis," so as to compare the allegations and acts underlying each claim. *Partee v. City of Memphis*, 449 F. App'x 444, 449 (6th Cir. 2011).

Here, the Court finds the TGTLA has not waived Dickson's immunity against any of Harrison's state law claims. First, as a simple matter of law, Harrison cannot hold Dickson vicariously liable under the TGTLA for its employees' intentional torts of assault, battery,

outrageous conduct, and intentional infliction of emotional distress, unless Harrison does so through a separate negligence claim against Dickson. Tenn. Code Ann. § 29-20-205(2); *Pendleton*, 2005 WL 2138240, at *3. Thus, Dickson is immune from each of these claims against Goodwin individually. Second, while Harrison has appropriately pleaded a separate claim against Dickson for its negligence, the Court finds this claim and Harrison's negligence claim against Goodwin alone arise out of the same circumstances as his § 1983 claims. The claims all focus exclusively on Goodwin's actions on November 1, 2010, or on Dickson's training and supervision of its officers. Harrison does not dispute that both sets of claims share the same underlying facts. (Doc. No. 35 at 20.) As a result, the Court finds Dickson immune from suit on all of Harrison's state law claims and these claims are **DISMISSED with prejudice**, as relates to Dickson only.[5]

       3.   <u>Individual Claims against Goodwin</u>

While Defendants do not challenge Harrison's negligence claim against Goodwin, they do move for summary judgment on his assault and battery, outrageous conduct, and intentional infliction of emotional distress claims against Goodwin. (Doc. No. 28 at 17–18.)

First, as to Harrison's assault and battery claim, Defendants argue only that Harrison is collaterally estopped from asserting the claim because he has failed to establish his excessive force claim under § 1983. (*Id.* at 17.) However, as discussed above, the Court finds Harrison has established a valid Fourth Amendment claim under § 1983. *See Griffin v. Hardrick*, 604 F.3d 949, 956–57 (6th Cir. 2010) (a state law claim for battery arising out of the same use of force as an "excessive use of force" claim under § 1983 are analyzed identically). Thus, summary judgment is **DENIED** as to Harrison's assault and battery claim against Goodwin.

---

[5] Because a governmental employee named in his official capacity shares government immunity from suit, Harrison's state law claims also are **DISMISSED,** as relates to Goodwin in his official capacity. *See Autry v. Hooker*, 304 S.W.3d 356, 364 (Tenn. Ct. App. 2009). No claims remain against Goodwin in his official capacity.

Second, as to Harrison's outrageous conduct and intentional infliction of emotional distress claims, Defendants argue Harrison has not alleged sufficiently outrageous conduct to survive summary judgment. (Doc. No. 28 at 18.) Under Tennessee law, "[i]ntentional infliction of emotional distress and outrageous conduct are different names for the same cause of action" for intentional infliction of emotional distress. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204–05 (Tenn. 2012) (citation omitted). To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Id.* at 205. As to the second element, it is well-settled that "[a] plaintiff must show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Here, the Court finds that summary judgment is inappropriate. To begin, the Court finds that Defendants have not met their burden at summary judgment to show no dispute of material fact exists. Beyond stating the standard for intentional infliction of emotional distress and making a conclusory statement that Harrison has failed to show adequate outrageousness, Defendants do not argue any specific facts in support, nor do they compare Harrison's claim to the facts of any past cases deciding the issue. (Doc. No. 28 at 18.) Though the Court notes that Harrison makes a similar one-line, unsupported statement that he has shown outrageousness (Doc. No. at 25), the burden at this stage is on Defendants, even if Harrison failed to respond. *See Woodby v. Bradley Cnty.*, No. 1:07-cv-3, 2008 WL 5245361, at *13 (E.D. Tenn. Dec. 16, 2008) (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)).

In addition, the Court finds that Harrison has shown sufficient evidence for a reasonable jury to find Goodwin's conduct outrageous and that it constituted intentional infliction of emotional distress. There is no dispute that Goodwin intended to strike Harrison in order to grab Harrison's pocket knife. As to the mental injury Harrison suffered, he testified that the incident led to anxiety, depression, fear and embarrassment, among other ailments. *See Rogers*, 367 S.W.3d at 209–10 (holding that a plaintiff may show he suffered severe mental injury with evidence of emotional distress, including anxiety, humiliation, embarrassment, and worry).

As to the outrageousness of Goodwin's conduct, a reasonable jury could find it beyond the bounds of decency for an officer to strike—without warning—a non-threatening accident victim in the face, when the victim had obvious injuries that could be worsened by physical contact. *See Alexander v. Newman*, 345 F. Supp. 2d 876, 888 (W.D. Tenn. 2004) ("Unprovoked beatings by officials who are hired to protect and serve the community could certainly be deemed intolerable in a civilized community."). *See also Ramsey v. Chattanooga Hous. Auth.*, No. 1:09-cv-233, 2011 WL 2601016, at *8 (E.D. Tenn. June 30, 2011) (denying summary judgment on an intentional infliction of emotional distress claim against an officer accused of excessive force by grabbing and striking plaintiff to handcuff her); *Evans v. City of Etowah*, No. 1:06-cv-252, 2008 WL 918515, at *12 (E.D. Tenn. April 3, 2008) (plaintiff's excessive force claim—that an officer knocked her to the ground, picked her up, threw her down on a sofa, and kicked her in the back of her leg in the course of a search and arrest—"implicate[d] conduct sufficiently outrageous" to constitute intentional infliction of emotional distress); *Bettis v. Pearson*, No. 1:04-cv-112, 2007 WL 2426404, at *13 (E.D. Tenn. Aug. 21, 2007) ("Plaintiff has preserved the issue of whether [an officer's] actions fall into the narrow class of conduct which a civilized community would not tolerate. His act of pinning down Plaintiff and deploying mace spray in his face at close range, unprovoked and while

28

handcuffed, may well cause 'an average member of the community [to] arouse his resentment against [Defendant . . . ], and lead him to exclaim, "Outrageous!"'").

Thus, the Court treats Harrison's outrageous conduct and intentional infliction of emotional distress claims against Goodwin as one claim, and **DENIES** summary judgment as to this claim.

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS** the Motion for Summary Judgment (Doc. No. 20), as to Harrison's (1) § 1983 claims based on violations of the Fourteenth Amendment; (2) § 1983 claim against Dickson based on its failure to supervise or discipline officers; (3) federal and state law claims against Goodwin in his official capacity; and (4) state law claims against Dickson. The Court **DENIES** the Motion as to the remaining claims.  In addition, as described above, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion to Strike (Doc. No. 43).

It is so ORDERED.

Entered this the ___11th_____ day of April, 2013.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT